Slip Op. 07-65

UNITED STATES COURT OF INTERNATIONAL TRADE

| | | | |
|---|---|---|---|
| USEC INC. and UNITED STATES ENRICHMENT CORPORATION, | : | | |
| | : | | |
| Plaintiffs, | : | | |
| | : | Before: | WALLACH, Judge |
| v. | : | Court Nos.: | 02-00112, 02-00113, |
| | : | | 02-00114 |
| UNITED STATES, | : | | |
| | : | **PUBLIC VERSION** | |
| Defendant. | : | | |
| | : | | |

[Plaintiff's 56.2 Motion for Judgment on the Agency Record is Denied.]

Dated: May 4, 2007

Steptoe & Johnson LLP, (Eric C. Emerson, Sheldon E. Hochberg, and Evangeline D. Keenan) for Plaintiff USEC Inc. and United States Enrichment Corporation.

Pillsbury Winthrop Shaw Pittman LLP, (Nancy A. Fischer, Joshua Dennison Fitzhugh, Sanjay J. Mullick and Stephan E. Becker) for Plaintiff-Intervenor Ad Hoc Utilities Group.

Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Michael D. Panzera and Stephen C. Tosini, Attorneys, Commercial Litigation Branch, Civil Division, United States Department of Justice, for Defendant United States.

Fried, Frank, Harris, Shriver and Jacobson LLP, (Jay R. Kraemer and William Taft) for Defendant-Intervenors Urenco, Inc., Urenco Ltd., Urenco Deutschland GMBH, Urenco Capenhurst Ltd., and Urenco Nederland B.V.

## OPINION

**Wallach, Judge:**

**I**
**Introduction**

Plaintiffs USEC Inc. and its wholly owned subsidiary United States Enrichment Corporation (collectively "USEC") challenge the final antidumping and countervailing duty determination of the United States Department of Commerce ("the Department" or "Commerce") with regard to low enriched uranium ("LEU") from Germany, the Netherlands, and the United Kingdom. This opinion considers antidumping issues, both general and country-specific.

The administrative determination under review is the final determination by Commerce of sales at not less than fair value ("LTFV") with respect to LEU from Germany, the Netherlands, and the United Kingdom, covering the period of investigation ("POI") from October 1, 1999 through September 30, 2000, set forth in Notice of Final Determinations of Sales at Not Less Than Fair Value: Low Enriched Uranium From the United Kingdom, Germany, and the Netherlands, 66 Fed. Reg. 65,886 (December 21, 2001) ("Final Determination").

This court exercises jurisdiction pursuant to 28 U.S.C. § 1581(c).

**II**
**Background**

This case comes before the court after consolidated decisions before a three-judge panel, the Court of Appeals for the Federal Circuit ("Federal Circuit") and several remands to the Department of Commerce. USEC v. United States, 259 F. Supp. 2d 1310 (CIT 2003) ("USEC I"); USEC v. United States, 281 F. Supp. 2d 1334 (CIT 2003) ("USEC II"); Eurodif S.A. v.

<u>United States</u>, 411 F.3d 1355 (Fed. Cir. 2005) ("<u>Eurodif I</u>"); <u>Eurodif S.A. v. United States</u>, 423

F.3d 1275 (Fed. Cir. 2005) ("<u>Eurodif II</u>"); <u>Eurodif S.A. v. United States</u>, 414 F. Supp. 2d 1263

(CIT 2006) ("<u>Eurodif III</u>"); <u>Eurodif S.A. v. United States</u>, 431 F. Supp. 2d 1351 (CIT 2006)

("<u>Eurodif IV</u>"); and <u>Eurodif S.A. v. United States</u>, 442 F. Supp. 2d 1367 (CIT 2006) ("<u>Eurodif</u>

<u>V</u>").  A brief review follows.

On December 7, 2000, USEC petitioned Commerce to initiate an antidumping duty

investigation on imports of LEU from Germany, the Netherlands, and the United Kingdom.  In

its <u>Final Determination</u>, Commerce calculated zero percent margins for Germany and the

Netherlands and a <u>de minimis</u> margin for the United Kingdom. <u>Final Determination</u>, 66 Fed.

Reg. at 65,888.  The antidumping and countervailing duty determination covered all LEU.[1]

Urenco Ltd. ("Urenco"), the Defendant-Intervenor in these cases, is a holding company

located in the United Kingdom, which holds 100 percent of the stock in Urenco Deutschland

GmbH ("UD"), located in Germany; Urenco (Capenhurst) Ltd. ("UCL"), located in the United

Kingdom; Urenco Nederland B.V. ("UN"), located in the Netherlands; and Urenco Investments,

Inc.  Urenco Ltd. owns Urenco, Inc., a Delaware corporation that acts as Urenco Ltd.'s marketing

arm and contracts representative in the United States, through Urenco Investments.

The parties' challenges are now ripe for adjudication.[2]  In the court's original Scheduling

---

[1] "LEU is enriched uranium hexafluoride ($UF_{[6]}$) with a $U^{<235>}$ product assay of less than 20 percent that has not been converted into another chemical form, such as $UO_{[2]}$, or fabricated into nuclear fuel assemblies, regardless of the means by which the LEU is produced (including LEU produced through the down-blending of highly enriched uranium)." <u>Id.</u> at 65,887.

[2] The arguments decided here were filed by the parties before the three-judge panel in 2002-2003, prior to the Federal Circuit decisions in the <u>Eurodif</u> line of cases.  Separate issues were assigned to each participant in that panel after general issues were decided.

Order, the three judge panel decided, and the parties agreed, to address initially "general issues" affecting the Department's threshold determinations, to be followed later by case-specific issues, such as "challenges to the Department of Commerce's calculation results and methods." Scheduling Order at 6 (August 5, 2002).  The threshold issues were decided by the three-judge panel and the Federal Circuit in USEC I, USEC II, Eurodif I, Eurodif II, Eurodif III, Eurodif IV and Eurodif V.

The Federal Circuit in both Eurodif I and Eurodif II held that the separative work unit ("SWU") contracts for uranium enrichment there at issue were contracts for services and therefore not subject to the antidumping duty ("AD") laws, and that 19 U.S.C. § 1673 unambiguously applies to sales of goods and not services.[3] Eurodif I, 411 F.3d at 1361-62; Eurodif II, 423 F.3d at 1276.  The court in Eurodif I held that there was no transfer of title or ownership of the LEU from the utility to the enricher since the utility retains title to the quantity of the enriched uranium that it supplies to the enricher. Eurodif I, 411 F.3d at 1360.  Pursuant to the court's remand in Eurodif III, and as upheld by this court in Eurodif V, Commerce's Final Results of Redetermination Pursuant to Court Remand (June 19, 2006) ("Remand Redetermination") amended the scope language in the original antidumping and countervailing duty order, thereby excluding uranium enrichment services contracts from the order. See Eurodif

---

[3] A SWU contract is a contract for a "separative work unit," a measurement of the amount of energy or effort required to separate a given quantity of feed uranium into LEU and depleted uranium at specified assays. In these SWU contracts, the enricher enriches the unenriched uranium and delivers LEU to the purchaser. See, e.g.,  Eurodif I, 411 F.3d at 1357; USEC v. United States, Slip Op. 03-170, 2003 Ct. Int'l Trade LEXIS 170, at *7 n.8 (December 22, 2003).

III, 414 F. Supp. 2d at 1263; Eurodif V, 442 F. Supp. 2d at 1367; Remand Redetermination.[4]

Contracts for sales of LEU are unaffected by the previous Eurodif cases, and remain within the

scope of the antidumping duty order.  At oral argument, the parties agreed that the calculational

issues related to enrichment services contracts in these case numbers are not mooted because

Commerce, on remand in consolidated court numbers 02-00219 and 02-00221, did not address

these particular issues.

Familiarity with the courts' prior opinions is presumed.

### III
### Standard of Review

In reviewing Commerce's antidumping duty determinations, the court must sustain any

determination, finding, or conclusion unless it is unsupported by substantial evidence on the

record or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B); Fujitsu Gen. Ltd. v.

United States, 88 F.3d 1034, 1038 (Fed. Cir. 1996).  "Substantial evidence means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." Consol. Edison

v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938) (internal citations omitted).

The possibility of drawing two inconsistent conclusions from the same evidence does not mean

that Commerce's findings are not supported by substantial evidence. Consolo v. Fed. Maritime

Comm'n, 383 U.S. 607, 620, 86 S. Ct. 1018, 16 L. Ed. 131 (1966).

---

[4] Following the Eurodif line of cases, contracts for the sale of LEU would still be
included within the ambit of the antidumping duty order.  Urenco acknowledged at oral argument
that a portion of the contract with [Utility A] involved a sale of LEU to a U.S. utility.  Because
Commerce found a de minimis dumping margin for the United Kingdom, and a zero percent
margin for Germany and the Netherlands, this fact does not affect the calculation of Urenco's
dumping margin.

When reviewing the Department's construction of the antidumping statutes, the court first considers whether Congress has spoken directly to the question at issue.  Chevron U.S.A. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984). If Congress has addressed the issue, then the court must follow the expressed intent of Congress. Id.  However, if the issue has not been addressed by Congress, "the court does not simply impose its own construction on the statute . . . [r]ather . . . the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id.  In its analysis, the court need not conclude that the agency's construction is the only permissible construction, or even the reading the court would have reached, in order to find the agency's interpretation reasonable. Id. at 843 n.11 (citing FEC v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 39, 102 S. Ct. 38, 70 L. Ed. 2d 23 (1981)).  "[A] court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another." Koyo Seiko Co. v. United States, 36 F.3d 1565, 1570 (Fed. Cir. 1994).

To ascertain whether Congress has spoken on an issue, the court considers the plain text of the statute, canons of statutory construction, structure of the statute, and legislative history. Timex V.I. v. United States, 157 F.3d 879, 882 (1998).

## IV
## General Issues Analysis Pertaining To All Three Case Numbers

The first four issues discussed infra are common to each of USEC's challenges with respect to LEU from Germany, the Netherlands, and the United Kingdom.  Country-specific issues are discussed in Section V infra.  Case number 02-00112 concerns LEU from the United Kingdom, 02-00113 LEU from Germany, and 02-00114 LEU from the Netherlands.

**A**
**Commerce Made a "Fair Comparison" Between Urenco's U.S. Export Price and Normal Value Based on Period of Investigation Sales Data**
**1**
**Parties' Arguments**

USEC argues that Commerce failed to make a "fair comparison" between Export Price ("EP")[5] and Normal Value ("NV")[6] because its date-of-sale methodology allegedly prevented it from doing so. Brief of USEC Inc. and United States Enrichment Corporation in Support of Rule 56.2 Motion for Judgment on the Agency Record ("USEC's Motion") at 18, 24.[7]  USEC also claims that Commerce erred in calculating Urenco's EP by comparing, or "blending" POI data with a pre-POI sales contract, resulting in a higher price than the POI sale alone and manipulating the LTFV calculation. Id.  USEC states that it raised its concerns as early as the initial petition, and that Commerce has been silent on this issue. Id. at 12-13.  USEC seeks a LTFV recalculation

---

[5] Section 1677a(a) defines Export Price as:

> the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States . . . .

[6] Normal Value is defined as:

> [T]he price at which the foreign like product is first sold . . . for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price . . . .

19 U.S.C. § 1677b(a)(1)(B).

[7] All citations to Parties' briefs refer to the briefs in court number 02-00112, unless otherwise specified.

based only on the price of Urenco's new U.S. sales during the POI, "net of any effect of pre-POI sales activity." Id. at 14.  Commerce may deviate from its standard methodology and practice in making comparisons, USEC contends, if conforming to them would not be fair, and if a deviation would more fully comply with the overarching purpose of the Act. Id. at 26.

USEC further argues that quantities of LEU "sold" during the POI under the contracts between Urenco and [Utility B] (a U.S. utility) constitute a distinct sale separate from its pre-POI obligation before the contract renegotiations. USEC's Motion at 16-17. USEC also claims that when Urenco and its customers enter into a new or amended contract that includes new quantity commitments in addition to pre-existing commitments, the new quantity commitments constitute a 'distinct sale' as a matter of law. Id. at 15.

Defendant counters that "fair comparison" is not an additional requirement, as the term generally describes the calculations contemplated by the statute, and does not place an additional, independent requirement upon Commerce. Defendant's Response in Opposition to the Motion for Judgment Upon the Agency Record Filed by USEC Inc. and United States Enrichment Corporation ("Defendant's Response") at 18, 20, 24.  The Government also says that Commerce correctly used the new price terms in Urenco's renegotiated contracts as the basis for calculating EP for all future deliveries by using Commerce's regular date-of-sale methodology to effectuate a fair comparison. Id. at 9.  Finally, Defendant argues that its normal methodology best reflected commercial reality. Id. at 18, 20, 24.

Defendant also argues that Commerce's determination to apply the new contract terms for all deliveries made pursuant to the amended contracts best reflects the commercial reality of the contractual renegotiations, as opposed to USEC's proposed methodology. Id. at 26.  Defendant

further claims that treatment of transactions after the contract renegotiations as a "distinct sale" is

contrary to agency practice and precedent. Id. at 25.

Defendant argues that USEC incorrectly focuses on individual quantities, rather than

entire contracts, in making its argument about a "fair comparison." Id. at 30-31.  Defendant

further argues that Commerce's determination to apply the new contract terms for all deliveries

made pursuant to the amended contracts "reflects the reality," as opposed to USEC's proposed

methodology. Id. at 26.  Defendant notes that "specific changes in certain amendments

introduced contractual terms that cannot be accounted for by USEC's proposed methodology."

Id. at 27 (citing Memorandum from Cindy Lai Robinson, et al., Import Compliance Specialists,

Office of AD/CVD Enforcement, U.S. Dep't of Commerce, to Melissa Skinner, Dir., Office of

AD/CVD Enforcement, U.S. Dep't of Commerce, Verification of the Sales Responses of Urenco

Ltd. et al., (October 4, 2001) ("Sales Verification Report") at 5).

Urenco's arguments parallel those made by Commerce.


**2**
**Discussion**
**a**
**The Department's Chosen Date-of-Sale Methodology Is Supported By Substantial Evidence and In Accordance With Law**

The date of sale is an issue because Urenco renegotiated its SWU contracts to two U.S.

utility customers, [Utility B] and [Utility A] during the POI. USEC's Motion at 11.  USEC

essentially argues that Commerce should have based its methodology only on LEU delivered

pursuant to the renegotiated contract terms, and should not have considered quantities delivered

prior to the renegotiations. Id.

The "fair comparison" requirement is found in 19 U.S.C. § 1677b(a), which provides that "[i]n determining under this title whether subject merchandise is being, or is likely to be, sold at less than fair value, a fair comparison shall be made between the export price [EP] or constructed export price [CEP] and normal value [NV]." (Emphasis added).  The statute describes NV as the price "reasonably corresponding to the time of sale used to determine the [EP] or [CEP]," but does not specify the manner in which Commerce must determine the time of sale. 19 U.S.C. § 1677b(a)(1)(A).  The Department's date-of-sale regulation also provides that it:

> [N]ormally will use the date of invoice . . . [h]owever, the Secretary may use a date other than the date of invoice if the Secretary is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale.

19 C.F.R. § 351.401(i).

In the preamble to this section, Commerce noted that due to the "unusual nature of long-term contracts . . . date of invoice normally would not be an appropriate date of sale . . . ." Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,350 (May 19, 1997) ("Preamble to Final Rules").  Further, "[t]he date on which the material terms of sale are finally set would be the appropriate date of sale for such contracts." Id.  This has also been Commerce's practice in other cases dealing with long-term contracts. See, e.g., Certain Corrosion-Resistant Carbon Steel Flat Products and Certain Cut-to-Length Carbon Steel Plate From Canada: Preliminary Results of Antidumping Duty Administrative Reviews and Recision of Reviews in Part, 65 Fed. Reg. 54,481, 54,485 (September 8, 2000) ("For Dofasco's sales made pursuant to long term contracts, we used date of contract as date of sale"); Final Affirmative Countervailing Duty Determination: Stainless Steel Sheet and Strip in Coils from the Republic of Korea, 64 Fed.

Reg. 30,664, 30,679 (June 8, 1999).

Even if material terms of sale are not changed, Commerce maintains the authority to use a different date-of-sale methodology. <u>Hornos Electricos De Venez., S.A. v. United States</u>, 285 F. Supp. 2d 1353, 1367 (CIT 2003).  "The Department may exercise its discretion to rely on a date other than invoice date for the date of sale only if 'material terms' are not subject to change between the proposed date and the invoice date, or the agency provides a rational explanation as to why the alternative date 'better reflects' the date when 'material terms' are established." <u>SeAH Steel Corp. v. United States</u>, 25 CIT 133, 135 (2001) (citing <u>Thai Pineapple Canning Indus. Corp., Ltd. v. United States</u>, 24 CIT 107, 109, 273 F.3d 1077 (2000), <u>rev'd on other grounds</u>). The terms renegotiated by Urenco included price and quantity, terms determined to be material both by this court and Commerce. <u>See, e.g.</u>, <u>SeAH Steel Corp. v. United States</u>, 25 CIT 133 (price, quantity and payment terms material); <u>Stainless Steel Sheet and Strip in Coils from the Republic of Korea</u>, 64 Fed. Reg. 30,664, 30,679 (1999) (price and quantity material).

Commerce has consistently held that a new date of sale is established for all future deliveries, governed by the amended terms, when parties renegotiate material terms of sale. <u>See, e.g.</u>, <u>Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Japan</u>, 64 Fed. Reg. 55,243, 55,245 (October 12, 1999); <u>Certain Corrosion-Resistant Carbon Steel Flat Products and Certain Cut-to-Length Carbon Steel Plate from Canada</u>, 64 Fed. Reg. 2173, 2178 (January 13, 1999) ("<u>Canada</u>").  Because these terms are material based on court and agency precedent, USEC's argument fails.

The party seeking to establish a date of sale other than invoice date bears the burden of producing sufficient evidence demonstrating that "another date . . . better reflects the date on

which the exporter or producer establishes the material terms of sale." Viraj Group, Ltd. v.

United States, 343 F.3d 1371, 1377, n.1 (Fed. Cir. 2003) ("Viraj IV") (citing 19 C.F.R. §

351.401(i) (2003));  Allied Tube & Conduit Corp. v. United States, 25 CIT 23, 25, 132 F. Supp.

2d 1087 (2001).

USEC cites Titanium Sponge from Japan, 54 Fed. Reg. 13,403 (April 1, 1989)

("Titanium") in support of its argument that Commerce chose the wrong date of sale. Reply Brief

of USEC Inc. and United States Enrichment Corporation ("USEC's Reply") at 4-5.  In Titanium,

a U.S. customer signed a minimum quantity contract and purchased amounts above that quantity

at the contract price; Commerce determined the date of sale for the minimum quantity as the date

the contract was signed, and for all amounts sold over the minimum quantity the date the delivery

instructions were issued was designated the date of sale.  Here, the issue is not a minimum

quantity contract, but renegotiations of a contract.  Titanium is accordingly distinguishable.

USEC also cites several cases in support of its argument that Commerce must reconsider

its methodology on remand and adopt USEC's proposed methodology. USEC's Motion at 25-26

(citing Budd Co. v. United States, 14 CIT 595, 746 F. Supp. 1093 (1990) ("Budd I"); Budd Co.

v. United States, 15 CIT 446, 447, 773 F. Supp. 1549, 1550-51 (1991) ("Budd II"); Viraj Group,

Ltd. v. United States, 25 CIT 1017, 162 F. Supp. 2d 656 (2001) ("Viraj I"), after remand, 26 CIT

290, 193 F. Supp. 2d 1331, 1338 (2002) ("Viraj II"), after remand, 26 CIT 585, 206 F. Supp. 2d

1340 (2002) ("Viraj III"), rev'd, 343 F.3d 1371 (Fed. Cir. 2003) ("Viraj IV")).  Its reliance is

misplaced.  The remands in those cases concerned different issues, or specifically deferred to the

Department's discretion in choosing its own methodology. See Budd I; Budd II; Viraj I; Viraj II;

Viraj III; Viraj IV.

Specifically, USEC relies on the <u>Budd</u> cases for the proposition that for Commerce to effectuate a fair comparison, it must make a contemporaneous comparison of sales activity. USEC's Motion at 10; <u>see</u> 19 U.S.C. § 1677b(a)(1)(A).  While it is clear from precedent and the statute that such comparisons are required, the statute does not mandate <u>how</u> Commerce must achieve that "apples with apples" comparison. <u>See</u> <u>Smith-Corona Group v. United States</u>, 713 F.2d 1568, 1578 (Fed. Cir. 1983).  These cases that USEC cites stand for general principles regarding fairness of implementation of the dumping laws; they are not supportive of USEC's argument. <u>See</u> <u>Budd I</u>, 14 CIT at 595; <u>Budd II</u>, 15 CIT at 446; <u>Smith-Corona Group</u>, 713 F.2d at 1578.

<u>Budd I</u> concerned a review of the Department's circumstances of sale adjustments to adjust the effect of currency discrepancies in a hyperinflationary economy.[8]  The circumstance of sale adjustment enabled Commerce to "reconstruct a reference point whereby these values are being compared with the U.S. price at the same point in time." <u>Budd I</u>, 14 CIT at 605 (examining <u>Amended Final Determination of Sales at Less than Fair Value and Amended Antidumping Duty Order; Tubeless Steel Disc Wheels From Brazil</u>, 53 Fed. Reg. 34,566 (September 7, 1988) ("<u>Brazil</u>")).  The court in <u>Budd I</u> upheld Commerce's determination, deferring to its methodology, which used a circumstance of sale adjustment in order to effectuate a fair comparison. <u>Id.</u> at 607.  The court deferred to Commerce's broad authority to "choose to effectuate the primary statutory purpose in favor of fair determinations based on contemporaneous comparison." <u>Id.</u> at 604 (citing <u>Smith-Corona Group</u>, 713 F.2d at 1578).  In the

---

[8] The progenitor litigation to the <u>Budd</u> cases which originally remanded to Commerce was <u>Borlem S.A. v. United States</u>, 12 CIT 563 (1988).

case <u>sub judice</u>, the record shows no manipulation or unfairness resulting from Commerce's chosen date of sale methodology.  To the contrary, Commerce's decision to use its date of sale methodology reflects consideration of Urenco's contractual renegotiations of material terms, which complies with the broad "fair comparison" requirement in the statute. <u>See</u> 19 U.S.C. § 1677b(a).  USEC interprets the "apples to apples" comparison in the statute too literally in arguing the merits of its proposed methodology. <u>See</u> <u>Smith-Corona Group</u>, 713 F.2d at 1578.

In <u>Budd I</u>, had Commerce not made a circumstance of sale adjustment within its discretion, it would have not made an accurate contemporaneous comparison.  However, the court noted that the underlying Commerce determination in <u>Budd I</u> was "narrowly tailored to the facts" because of a unique circumstance[9] which does not exist in this case.[10] <u>Budd I</u>, 14 CIT at 599 (citing <u>Brazil</u>, 53 Fed. Reg. at 34,567).

Defendant contests USEC's reliance on the <u>Viraj</u> line of cases for the broad proposition that a failure to explain why a methodology is a "fair comparison" is itself grounds for a remand. Defendant's Response at 23.  In <u>Viraj II</u>, the court remanded to Commerce to consider the most

---

[9] The unique circumstance present in <u>Budd I</u> was Brazil's hyperinflationary currency. <u>Budd I</u>, 14 CIT at 598. To account for the effects of Brazil's unstable economy, Commerce constructed foreign market value for six different one-month periods, using replacement costs. "This practice allows the Department to view costs and prices contemporaneously in order to avoid distortions caused by hyperinflation and achieve a fairer comparison." <u>Brazil</u>, 53 Fed. Reg. at 34,566.  Commerce subsequently made a circumstance of sale adjustment to account for the devaluation of Brazil's currency, "eliminat[ing] the artificial distortion of value caused by the rapid depreciation of Brazil's currency and . . . more accurately provides a measure of whether dumping is occurring." <u>Id.</u>  Commerce's usual methodology is to calculate a single constructed value for the entire POI.

[10] In <u>Budd II</u>, Plaintiff challenged the underlying reasoning of the same amended final determination, and the court once again denied Plaintiff's claims. <u>Budd II</u>, 15 CIT at 448.  Thus, <u>Budd II</u> is similarly unhelpful to Plaintiff.

accurate methodology because a methodology may be "unreasonable in a given case when a more accurate methodology is available and has been used in similar cases." 26 CIT at 296 (quoting Thai Pineapple, 273 F.3d at 1085).  After three remands, the Department changed its methodology.  On appeal, the Federal Circuit held Commerce acted unlawfully when it utilized a date of payment methodology rather than using the date of sale, because Commerce is to utilize date of sale except when certain exceptions apply, which were not applicable in that case. Viraj IV, 343 F.3d at 1377.  Here, the contract renegotiations qualify as an exception justifying Commerce's decision to use a date of sale methodology based on the contract renegotiation date. 19 U.S.C. § 1677b-1; Id.  USEC argues that a provision in the suspension agreement in Certain Cut-to-Length Carbon Steel Plate from South Africa, 62 Fed. Reg. 61,751, 61,752 (November 19, 1997) proves Commerce is willing "to make exactly" the type of calculation it advocates. USEC's Motion at 23.  At oral argument, however, USEC was unable to point to any evidence supporting its desired result.[11]

In this case, Commerce extensively analyzed USEC's proposed methodology, concluding Commerce's methodology "better reflected commercial reality." Defendant's Response at 24; Issues and Decision Memorandum from Bernard T. Carreau, Deputy Assistant Sec'y for Import Administration, U.S. Dep't of Commerce, to Faryar Shirzad, Assistant Sec'y for Import Administration, U.S. Dep't of Commerce (December 13, 2001) ("Decision Memo") cmt. 11. That Commerce did analyze USEC's methodology in detail distinguishes it from Viraj.  Unlike

---

[11] The court asked Plaintiff whether there is evidence that "the Department has ever been called upon to make the calculations USEC proposes." Transcript of Oral Argument ("Transcript") at 35.  Plaintiff responded, "We don't believe the Department has ever been faced with these specific facts before." Id.

Viraj, Commerce here made specific findings to support its determination that there was no reason to deviate from its normal methodology.[12]

USEC contends that Commerce had "an obligation" to make a contemporaneous fair comparison by treating the renegotiated quantities as a distinct sale. USEC's Reply at 5. USEC argues that because the price of LEU had steadily declined in the years prior to the POI, by combining the higher prices with the lower prices, Commerce's "blending" skewed the calculations. However, the statute does not mandate that Commerce treat those quantities that way. 19 U.S.C. § 1677b(a). "Obviously it would be inappropriate for Commerce to have two different methodologies, one for when prices are rising, and another for when prices are falling, so as to maximize dumping margins." Defendant's Response at 29. As long as the Department's methodology is a reasonable means of effectuating the statutory purpose of fairness and there is substantial evidence supporting its conclusions, Commerce's determination is correct. See Ceramica Regiomontana, S.A. v. United States, 810 F.2d 1137 (1987).

At verification, the Department found that the contracts had been renegotiated for a number of different reasons. Sales Verification Report at 5-6. Both in its Response and at oral argument, Commerce stated that it would be mere speculation on its part to assume the motivations of parties in contract negotiations. Transcript at 73. Further, Commerce confirmed during verification that Urenco did not view the [Utility A] contract as two separate sales, "one providing for delivery of [X% of Utility A's] requirements at the 'old' price and the other

---

[12] USEC acknowledged at oral argument that Urenco's contracts were not manipulative, but argued that Commerce's failure to address the issue leaves open the possibility in the future that manipulations can occur in other cases. Transcript at 14-15. Federal courts do not issue advisory opinions. See Flast v. Cohen, 392 U.S. 83, 95 88 S. Ct. 1942, 20 L. Ed. 2d 947 (1968).

providing for [a percentage] at the 'new' price." Urenco's Rule 56.2 Response Brief in Opposition to USEC's Motion for Judgment upon the Agency Record Regarding Low Enriched Uranium from the United Kingdom ("Urenco's Response") at 29 (alteration in original); see Sales Verification Report at 7.  Instead, "Urenco considered the blended price to cover one contract and one sale, i.e., their sale to [Utility A] and that [Utility A] only paid one price." Id. This point is well supported by the evidence in the record.

Under the amended and restated contract between Urenco and [Utility A], "Urenco agreed to provide [certain different contract consideration] as well.  The commercial reality is that Urenco and [Utility A] substantially renegotiated the terms of the pre-POI contract and emerged with a new, and very different, deal." Urenco's Response at 30 (emphasis in original).

USEC argues that these renegotiated terms in the new contract are mere form, and do not "really" govern future deliveries. USEC's Motion at 18.  Urenco responds that it renegotiated the terms of the pre-POI contract price in exchange for greater volume and less uncertainty, incorporating new terms in the already existing contract. Urenco's Response at 30.

The Department's decision to reject USEC's "separate contract" theory was correct and Commerce's methodology is supported by substantial evidence and is in accordance with law. For the purpose of determining Urenco's EP, the "date of contract" accurately reflected the date on which Urenco established the material terms of sale better than the date of invoice. 19 C.F.R. § 351.401(i); Preamble to Final Rules, 62 Fed. Reg. at 27,350.  USEC has identified no previous determination in which Commerce departed from its usual methodology to disregard quantities delivered pursuant to a pre-existing contract simply because it was renegotiated.

As Urenco correctly states, "USEC's proposed methodology would actually require the

Department to eschew the required reliance upon verifiable facts and records in favor of a convoluted and artificial mathematical analysis requiring substantial guess-work, speculation and assumption." Urenco's Response at 32.  Commerce rightly concluded that USEC's proposed methodology could not be accurately and consistently implemented. See Decision Memo at 22.

Based on the record evidence and longstanding methodology, Commerce properly determined that USEC's proposed methodology skews the realities of long-term contracts and renegotiated terms.  In the Notice of Preliminary Determination of Sales at Less Than Fair Value: Low Enriched Uranium From the United Kingdom; Preliminary Determinations of Sales at Not Less Than Fair Value: Low Enriched Uranium From Germany and the Netherlands; and Postponement of Final Determinations, 66 Fed. Reg. 36,748, 36,751 (July 13, 2001) ("Preliminary Determination"), Commerce considered USEC's proposed methodology and determined that "we have considered the amended contract to constitute an entirely new sale, and have included in the dumping analysis all deliveries to date pursuant to the amended contract." Preliminary Determination, 66 Fed. Reg. at 36,751. "Therefore, in calculating export price, Commerce applied to all quantities delivered pursuant to these amended contracts the new prices that had been agreed to by the parties pursuant to renegotiation." Defendant's Response at 16.  In the Final Determination, Commerce again rejected USEC's proposed "effective price" methodology. See Final Determination, 66 Fed. Reg. at 65,888 (citing Decision Memo cmt. 11). Commerce further explained its denial of USEC's methodology, stating that:

> [W]e disagree that these new prices and the new quantities can always be viewed as sale separate from the existing contract.  Rather, we find that the new prices and quantities are integrally related to the existing contract, which covers not just quantities and prices over extended periods but a host of other commercially relevant factors . . . . The fact that a new or amended contract may include new

18

quantity commitments in addition to pre-existing quantity commitments does not mean that the new quantity can be viewed as a distinct sale.

Decision Memo at 21-22 cmt. 11.  In its Decision Memo, Commerce described various factors besides price and quantity that entered into the negotiations.[13] Id.

Thus, Commerce's decision to use a date of contract methodology, as opposed to its regulatory presumption in favor of date-of-invoice as date of sale in calculating EP was supported by substantial evidence in the record, agency precedent, and court precedent. Applying Chevron deference to Commerce's chosen methodology, the court finds its decision to use the date of sale methodology based on the renegotiated contract date was reasonable. Because Commerce provided a rational explanation as to why the changes in the material terms in Urenco's renegotiated contracts merited a deviation from its normal date-of-sale analysis, it made a "fair comparison" in accordance with the statute. See Thai Pineapple, 24 CIT at 109.

**b**
**Fair Comparison Is Not An Additional Statutory Requirement**

Plaintiffs in two Federal Circuit cases made an argument identical to USEC's concerning the alleged additional requirement of a fair comparison. Corus Staal BV v. United States, 395

---

[13] Other factors Commerce considered included  "1) utilities' concerns for security of supply; 2) utilities' concerns for a diversity of supply sources, 3) Urenco's desire to maintain long-term relationships with customers, 4) changes in utilities' fuel procurement practices, and 5) the existence of price review clauses in contracts." Decision Memo at 22, cmt. 11 (citing Sales Verification Report at 5).  Commerce also considered factors listed in the U.S. International Trade Commission's Preliminary Determination, such as "discounts on pre-existing supply commitments, extended payment terms, the timing of the provision by the utilities of the converted uranium feedstock, and packaging and handling terms." Id. (citing Low Enriched Uranium from France, Germany, the Netherlands, and the United Kingdom, Inv. 701-TA-409-412 (Preliminary) and 731-TA-909-912 (Preliminary), USITC Pub. 3388 (January 2001)).

F.3d 1343 (Fed. Cir. 2005); Timken Co. v. United States, 354 F.3d 1334 (Fed. Cir. 2004).  In

rejecting the appellants' claims, the Circuit both times stated that the "fair comparison"

requirement of "[section] 1677b(a) does not impose any requirements for calculating normal

value beyond those explicitly established in the statute and does not carry over to create

additional limitations on the calculation of dumping margins." Corus Staal, 395 F.3d at 1348

(citing Timken, 354 F.3d at 1344) (alteration in original).  The implementing legislation for the

Uruguay Round Agreements Act supports this conclusion, stating "[t]o achieve such a fair

comparison, section 773 [§ 1677b] provides for the selection and adjustment of normal value to

avoid or adjust for differences between sales which affect price comparability." Uruguay Round

Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-826, at 822 (1994),

reprinted in 1994 U.S.C.C.A.N. 4040 ("SAA") at 820.

        Urenco argues that U.S. Steel Group v. United States, 25 CIT 1293, 1296 n.7, 177 F.

Supp. 2d 1325, 1329 n.7 (2001), directly contradicts USEC's new methodology contention. See

Urenco's Response at 14; USEC's Motion at 18 et seq.  Plaintiffs in U.S. Steel Group also

offered an argument identical to Plaintiff's here.  In U.S. Steel Group, the court "[had] not found,

nor [had] Plaintiffs presented, any authority supporting a construction of 'fair comparison' as a

separate or freestanding requirement." U.S. Steel Group, 25 CIT at 1296 n.7.  Similarly, this

court concludes based on a review of the record that Commerce achieved a 'fair comparison' by

complying with the requirements of the statute. Id.; Timken, 354 F.3d 1334 (finding that "fair

comparison" is not an additional requirement).

        Urenco also argues that USEC incorrectly relies on Ipsco, Inc. v. United States, 13 CIT

402, 406, 714 F. Supp. 1211, 1215 (1989), for the proposition that the court should remand when

Commerce fails to make a "'fair comparison,' even where Commerce was otherwise following its normal practices." USEC's Motion at 25; see also Urenco's Response at 15.  USEC indeed fails to recognize that Ipsco was reversed by the Federal Circuit, which held:

> [Commerce's] original methodology for calculating constructed value was a consistent and reasonable interpretation of section 1677b(e).  The trial court therefore also erred in substituting 'its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.'

Ipsco, 965 F.2d 1056, 1061 (Fed. Cir. 1992) (citation omitted).  The court cannot interfere with Commerce's interpretation of a statute unless it is unreasonable or not otherwise in accordance with law. See U.H.F.C. Co. v. United States, 916 F.2d 689, 698 (Fed. Cir. 1990).  In Int'l Union v. Brock, 816 F.2d 761, 765 (D.C. Cir. 1987), the D.C. Circuit Court of Appeals upheld the district court's substitution of its interpretation for that of the agency because the court found the agency's interpretation to be incorrect in that it conflicted with Congressional intent. Id. Specifically, the court found that "the practical effect [of] the Secretary's interpretation . . . graphically demonstrates the absurdity of the agency's construction . . . . It is well-understood that statutes must be construed so as to avoid illogical or unreasonable results." Id. at 766.  USEC argues that agency precedent cannot "override a statutory directive" and cannot "be excused" from administering the plain requirements of the Act, but does not point to anything specific that shows Commerce's interpretation to be so unreasonable or absurd for the court to replace its interpretation for that of Commerce. U.H.F.C. Co., 916 F.2d at 698; see, e.g., Chevron, 467 U.S. at 837; Zenith Radio Corp. v. United States, 437 U.S. 443, 451, 57 L. Ed. 2d 337, 98 S. Ct. 2441 (1978) (finding the agency's interpretation of the statute, entrusted by Congress to administer, is to be upheld unless it is unreasonable).

Commerce has achieved a fair comparison by complying with its own regulations. See 19

U.S.C. § 1677b(a).  Because the substantial evidence in the record shows that Commerce

complied with the statute, the Department's fair comparison was in accordance with law.

**B**
**Urenco's U.S. Sales Were Properly Characterized By Commerce As Export Price Sales**
**1**
**Arguments**

USEC argues that Commerce's treatment of Urenco's U.S. sales as EP sales, instead of

undertaking a Constructed Export Price ("CEP") analysis, is contrary to law and precedent as

articulated in AK Steel v. United States, 226 F.3d 1361 (Fed. Cir. 2000), and should be remanded

to Commerce.  USEC's Motion at 28.  USEC further argues that the level of sales activity by

Urenco, Inc., Urenco Ltd.'s U.S. affiliate, indicates that Commerce should have concluded that

these sales were made in the United States.  Id. at 30.  USEC cites AK Steel as support for the

proposition that Commerce is obligated to determine whether sales are to be classified as export

price sales or constructed export price sales based on all the record evidence, and not simply the

identity of the seller. Id. at 29.  USEC essentially argues that Urenco, Inc.'s marketing and sales

negotiation activities, as well as the choice of law clause in the contract, directs Commerce to

calculate CEP pursuant to AK Steel.  USEC also argues that a boilerplate provision which states

that the contract "shall be construed" as a contract made in the U.S., demonstrates that U.S. EP is

improper. Id. at 33.

Urenco counters that the language was inserted into the contract in order to clarify that

U.S. law would govern the contract because the contract was entered into outside the United

States and most of the performance of the contract was in Europe. Urenco's Response at 42.

Defendant argues that the Department properly concluded that Urenco Ltd.'s U.S. sales were EP

sales because the sales were contracted through Urenco Ltd., Urenco's headquarters located in

Marlow, U.K. Defendant's Response at 32, 38.

**2**
**Discussion**

Commerce calculates dumping margins by comparing either EP or CEP with NV of

subject merchandise. 19 U.S.C. § 1673, 1677a.  In comparing EP, Commerce determines the

price at which the subject merchandise is sold by a producer or exporter outside of the U.S. to an

unaffiliated purchaser in the U.S. § 1677a(a).  United States price is calculated using either an EP

methodology or a CEP methodology, depending on whether subject merchandise is sold to an

affiliated or unaffiliated purchaser in the United States.[14] § 1677a.  Normally, Commerce relies

---

[14] As noted above, the statute defines EP and CEP as follows:

(a) Export price

The term 'export price' means the price at which the subject
merchandise is first sold (or agreed to be sold) before the date of
importation by the producer or exporter of the subject merchandise
outside of the United States to an unaffiliated purchaser in the
United States or to an unaffiliated purchaser for exportation to the
United States . . . .

(b) Constructed export price

The term 'constructed export price' means the price at which the
subject merchandise is first sold (or agreed to be sold) in the
United States before or after the date of importation by or for the
account of the producer or exporter of such merchandise or by a
seller affiliated with the producer or exporter, to a purchaser not
affiliated with the producer or exporter . . . .

19 U.S.C. § 1677a(a)-(b).

23

on EP when the foreign exporter sells directly to an unrelated U.S. purchaser.  CEP is used when the foreign exporter makes sales through a related party in the United States. See Sharp Corp. v. United States, 63 F.3d 1092, 1093-94 (Fed. Cir. 1995).

In AK Steel the court held that use of the Department's test to classify a sale as an EP sale conflicted with the plain language of the statute, where the sales contract was between a U.S. purchaser and a U.S. affiliate of the foreign producer/exporter. AK Steel, 226 F.3d at 1368.[15] The statutory distinction between the use of Export Price or Constructed Export Price rests on 1) where the sale takes place and 2) whether the foreign producer or exporter and the U.S. importer are affiliated. Id. at 1369; 19 U.S.C. § 1677a(a)-(b).  Although USEC relies heavily on AK Steel in its argument, it is not determinative of the outcome of this issue because under the circumstances of this case, EP clearly applies pursuant to the statute. See AK Steel, 226 F.3d at 1369 ("When the EP definition is read in conjunction with the CEP definition, the alleged ambiguity in the EP definition disappears.")

 Urenco Ltd.'s records show that its sales were made outside of the U.S., and its questionnaire responses show that it controls its subsidiaries and affiliates and the selling procedures used.  Defendant's Response at 38.  "Throughout the Sales Verification Report, Commerce found that all sales contracts involved the customer(s) and Urenco Ltd., not Urenco, Inc. Defendant's Response at 40 (citing Sales Verification Report at 8, 9, 12). Further, Commerce found that only Urenco Ltd. decided when to respond to Requests for Proposals in connection with obtaining new business. Id. (relying on Sales Verification Report at 6).  A

---

[15] The AK Steel test involved a contract between a U.S. purchaser and a U.S. affiliate of the foreign producer/exporter.  In contrast, this case involves a U.S. purchaser and a foreign producer/exporter, which clearly falls within the ambit of the statute.

review of Urenco Ltd.'s "sales negotiation correspondence, contracts, invoices, shipping

documents, records of payment and movement expenses" in the U.S. market show that the sales

were tied to Urenco Ltd. Id. at 41 (relying on Sales Verification Report at 9).  Commerce also

confirmed that Urenco, Inc. sends contract proposals and defers to Urenco Ltd. for all business

decisions involving sales. Id. (citing Sales Verification Report at 31).  Urenco further explained

that Urenco Ltd. "issues order confirmations, organizes enrichment, arranges for shipment and

arranges for holding of product material at fabricators prior to book transfer to the customer.  In

contrast, Urenco, Inc. does not receive title to the imported LEU; nor does it perform the selling

activities that would be indicative of CEP sales." Urenco's Response at 40.

    At verification, Commerce analyzed Urenco Ltd.'s contracts and determined that the

transactions were made with unaffiliated purchasers in the U.S., thereby supporting its decision

to use EP instead of CEP.  Urenco, Inc., the U.S. affiliate, was not a party to the contracts at

issue. Defendant's Response at 44 (citing Antidumping Duties on Low Enriched Uranium From

Germany: Response to Section A of the Department's Questionnaire, April 2, 2001 ("UD Sect. A

Response") Exhibit B-1, JA-2259.  Though Urenco, Inc. carries out the marketing activities for

Urenco Ltd., Urenco, Inc. is not the de facto negotiating entity for Urenco Ltd.'s contracts.  The

relevant factor in Commerce's decision to use CEP or EP rests on whether an entity is actually

empowered to enter into a contract.  Urenco, Inc. being the marketing entity was not enough to

warrant use of CEP.

    USEC argues, both in its initial brief and in its Reply, that Commerce determined where

the contract was made and performed based solely on who made the sale, rather than where the

sale was made. USEC's Motion at 29; USEC's Reply at 13.  USEC provides no evidence that

Case 1:02-cv-00114-EJW   Document 185   Filed 07/16/07   Page 26 of 56

Commerce disregarded record evidence in its analysis; its arguments are merely unsupported assertions. There is substantial evidence, beyond merely the name Urenco Ltd., which supports Commerce's determination that the contract was indeed made and enrichment performed outside of the United States. See Sales Verification Report at 31; UD Sect. A Response at A-27, Exhibit B-1, JA-2241.

USEC argues that Pohang Iron & Steel Co. v. United States, 24 CIT 566, 571 (2000), stands for the proposition that the geographic location of the signing of a document is "irrelevant" to the CEP/EP determination. USEC is incorrect. The court in Pohang noted that the location is not dispositive, but certainly not irrelevant. Id. USEC is also incorrect in arguing that all contractual obligations are performed in the United States. See USEC's Reply at 14. There is ample evidence in the record showing Urenco Ltd. is the entity empowered to enter into contracts, and that the contract here was, in fact, consummated in the United Kingdom. Even though the contract states it "shall be construed" as being made in the United States, that statement in itself is not sufficient to show it was in fact made in the U.S. That statement is simply a choice by the parties of which law is to apply, rather than a factual statement of the place of its signing.[16]

---

[16] Choice of law clauses "protect the expectations of the parties . . . regardless of where the case is brought for litigation." THE LAW OF TRANSNATIONAL BUSINESS TRANSACTIONS § 4.20 (Ved P. Nanda & Ralph B. Lake, eds., 2002); see Phillips Petroleum v. Shutts, 472 U.S. 797, 822, 105 S. Ct. 2965, 86 L. Ed. 2d 628 (1985) (expectations of the parties is important when considering fairness); RESTATEMENT 2ND OF CONFLICT OF LAWS § 187 cmt. e (1988) (factors to consider are the "protection of justified expectations"); see also Edelmann v. Chase Manhattan Bank, N.A., 861 F.2d 1291, 1301 n.63 (1st Cir. 1988); but cf. Broad v. Rockwell Int'l Corp., 642 F.2d 929, 946 (5th Cir. 1981) (holding that in the event that parties are from different states, and the subject matter is national in scope, and where the contract states "it shall be deemed to be made under the laws of the state of New York, and for all purposes construed in accordance with laws of said State," New York law applies as the parties' choice of law.)

Because Commerce reasonably concluded that Urenco Ltd. in the United Kingdom was the contracting party, and that sales to U.S. customers were made by unaffiliated foreign producer/exporters, the <u>AK Steel</u> test is satisfied.[17] <u>See, e.g.</u>, <u>UD Sect. A Response</u> at A-13. Therefore, Commerce's decision to calculate Urenco Ltd.'s services using EP, instead of CEP, is supported by substantial evidence and in accordance with law.

## C
## Commerce's Calculation of Urenco's Normal Value is Supported By Substantial Evidence and in Accordance with Law
### 1
### Commerce Properly Excluded Urenco Ltd.'s Losses Resulting From Futures Hedging Contracts in its Calculation of Normal Value Because They Were Not Related to Manufacturing the Subject Merchandise

USEC argues that Commerce incorrectly excluded certain futures contracts losses from its LTFV calculation of NV because Urenco did not provide evidence that these losses were not associated with its manufacturing activities. USEC's Motion at 34-35. USEC claims that Commerce's determination was speculative, because it assumed that such losses occurred outside the POI since they exceeded payments received in a particular one-month period, and because it assumed that the losses were associated with selling activities, as opposed to manufacturing. <u>Id.</u>

Defendant counters that Commerce properly excluded Urenco Ltd.'s losses resulting from futures hedging contracts in its calculations of manufacturing costs because they were not related to manufacturing the subject merchandise. Defendant's Response at 51 (citing <u>Decision Memo</u> cmt. 17). Defendant cites ample evidence in the record which supports Commerce's

---

[17] The second factor in determining where the sale was made in the United States is whether title passes. <u>AK Steel</u>, 226 F.3d at 1372. During the enrichment process, the utility retains title to the quantity of unenriched uranium that it supplies to Urenco. <u>See</u> <u>Eurodif I</u>, 411 F.3d at 1362; <u>Eurodif II</u>, 423 F.3d at 1278.

determination that such foreign exchange losses related to Urenco Ltd.'s general selling activities and sales contracts entered into outside the POI, and not to its production activity.[18]

Urenco claims that two of the Department's findings specifically support its determination that the LTFV margin calculation should not reflect losses on currency futures contracts. Urenco's Response at 43. First, Urenco identifies the Department's finding that it is "reasonable to conclude that Urenco's hedging contracts, as well as the corresponding loss, are related to the activity being hedged, i.e., Urenco's sales." Urenco's Response at 43-44 (citing Decision Memo at 32-33 (citing Urenco 2000 Annual Report at 17)). Second, it points to the Department's conclusion that such losses were related to "[sales] contracts other than those entered into during the POI" based on evidence showing the amount of cash involved in Urenco's futures contracts far exceeded the revenue from Urenco's POI sales. Id.

There is no statute which speaks directly to adjustments reflecting currency hedging losses, and the statute concerning calculation of constructed value ("CV") offers only general guidance. See 19 U.S.C. § 1677b. Based on this general provision, Commerce determined that such losses were not related to production, which are the costs used to calculate CV. See 19 U.S.C. § 1677b(e)(1);[19] see also Notice of Final Determination of Sales at Less Than Fair Value:

---

[18] See, e.g., Decision Memo cmt. 17; UD Sect. A Response at A-1, A-47; Memorandum from Ernest Gziryan, Accountant, U.S. Dep't of Commerce, to Neal Halper, Dir., Office of Accounting, U.S. Dep't of Commerce, regarding Cost of Production and Constructed Value Calculation Adjustments for the Final Determination - [for Urenco Ltd. and Urenco Deutschland] (December 13, 2001) ("Cost Calculation Memo") at 4-5.

[19] 19 U.S.C. 1677b(e)(1) states, in pertinent part:

> [T]he constructed value of imported merchandise shall be an
> amount equal to the sum of -

<u>Steel Wire Rod from Trinidad & Tobago</u>, 63 Fed. Reg. 9177, 9181-82 (February 24, 1998) (the

Department includes currency losses related to manufacturing operations in its calculations, but

excludes those related to sales transaction).  Defendant explains:

> In the case of currency hedging, there is not necessarily a direct link to the specific
> activity generating the gains and losses.  In contrast, foreign exchange gains and
> losses directly associated with cash transactions involving purchases or sales are
> easily traced to a company's accounts payable and accounts receivable activity.

Defendant's Response at 53.  Commerce also reviewed Urenco's Fiscal Year 2000 report, which

indicated that its business is largely transacted in U.S. dollars, making Urenco continually

exposed to that currency. <u>Decision Memo</u> cmt. 17; <u>see also</u> <u>UD Sect. A Response</u> at A-1, 47.

Supporting that interpretation, Urenco's currency hedging contract was for the sale of U.S.

dollars. <u>Id.</u>  In making its determination, Commerce analyzed Urenco's contractual sales

information and audited financial statements, ultimately finding that the currency hedging

contracts were related to sales occurring outside the POI. Defendant's Response at 53-54.

Because the contracts were not directly tied to production activity, Commerce reasonably

excluded them from the calculation of CV.

Commerce's treatment of Urenco's losses attributable to currency hedging contracts is

supported by court and agency precedent.  The court and Commerce have previously rejected

adjustments related to foreign currency hedging. <u>See, e.g.</u>, <u>Thyssen Stahl AG v. United States</u>, 19

CIT 605, 614-15, 886 F. Supp. 23, 31 (1995), <u>aff'd without op.</u>, <u>Thyssen Stahl AG v. AK Steel</u>

---

> (1) the cost of materials and fabrication or other processing of any
> kind employed in producing the merchandise, during a period
> which would ordinarily permit the production of the merchandise
> in the ordinary course of business . . . .

19 U.S.C. § 1677b(e)(1).

Corp., 155 F.3d 574 (Fed. Cir. 1998); Certain Welded Carbon Steel Pipes and Tubes from Thailand, 65 Fed. Reg. 60,910 (October 13, 2000) (no hedging contract was directly tied to the sale in question, therefore the Department did not allow exchange rate loss adjustment).  Further, "[t]o claim a circumstance of sale adjustment to foreign market value, expenses must be related to the sales of the products under investigation, rather than to sales generally." LMI - La Metalli Industriale, S.p.A. v. United States, 13 CIT 305, 307, 712 F. Supp. 959 (1989) (citing Ipsco, Inc. v. United States, 12 CIT 384, 687 F. Supp. 633, 642 (1988)).  The Federal Circuit, reviewing this court's affirmation of Commerce's remand determination, upheld the Department's requirement that a direct relationship exist between currency hedging costs and sales in the foreign market of the subject products under investigation. LMI-La Metalli Industriale, S.p.A. v. United States, 912 F.2d 455, 458 (citing Ipsco, Inc., 687 F. Supp. at 642) (requiring that each expense be related to sales of the products under investigation)).  Additional support comes from the legislative history, which notes that circumstances of sale adjustments should be permitted if they are reasonably identifiable, quantifiable, and directly related to the sales under consideration. See H. R. Rep. No. 96-317 at 76 (1979).

Thus, Commerce's conclusion that Urenco's foreign exchange losses were associated with sales transactions is supported by substantial evidence, and is in accordance with law.

## 2
## Commerce's Exclusion of the Cost of Urenco's [Input] Contract Purchases Was Reasonable

USEC argues that Commerce departed from agency practice by excluding from its calculation of normal value, Urenco's purchases of [input] from its [Country A] supplier,

[Supplier A]. USEC's Motion at 39.  USEC further argues that Commerce erred because Urenco did not physically identify its quantity of [input] obtained from its supplier, thereby failing to differentiate it from [self-produced input] for U.S. utilities. Id. at 40-42 (citing Notice of Final Results of Antidumping Duty Administrative Review: Certain Pasta From Italy, 65 Fed. Reg. 7349 (February 14, 2000) ("Pasta").  USEC argues that Pasta requires that "the respondent must be able to demonstrate that the same physical product it purchased was sold and delivered to a given market." Id. at 40. Further, USEC claims that because Urenco has not established a "direct line" between purchased and resold [input], the cost of the "commingled" purchased [input] should have been included in the calculation of NV, consistent with Pasta. Id. at 42 (citing Pasta, 65 Fed. Reg. at 7,356).

The second argument put forth by USEC is that Urenco paid too much for its [input], and that therefore it could have also paid too little for [another form of processing by Supplier A].[20] Id. at 47.  Defendant counters that Commerce's exclusion of the cost of Urenco's [input] purchases from [Supplier A], a [Country A] supplier of LEU, was reasonable because the [input] acquired from [Supplier A] was segregated and was never sold in the United States. Defendant's Response at 56; Transcript at 77.  Defendant also disagrees with USEC's argument that Commerce has broken with past practice. Commerce was consistent with past practice, Defendant argues, because the purchased [input] was not subject merchandise, but was purchased from a third country. See Defendant's Response at 56, 59; Pasta, 65 Fed. Reg. at 7,356 cmt. 10. Defendant argues that Pasta stands for the proposition that Commerce's practice is to either

---

[20] [The other form of processing is a process rendered upon] depleted uranium after the original enrichment process. USEC's Motion at 5,45-6.

include the cost of merchandise from an unaffiliated supplier that cannot be separately identified in the weighted-average cost of manufacture, or to exclude such costs if the product "can be directly tied to specific sales by the respondent." Defendant's Response at 59.

Defendant further argues that Commerce based its determination on three findings, the first being that suppliers of [input] do not qualify as respondents in this proceeding, so their products were excluded from the analysis. Id. at 58 (citing Cost Calculation Memo at 4). Second, Commerce found that the nuclear industry keeps such tight control over the location of nuclear material that the products continued to be separately identifiable. Id.  Third, it says, there was no evidence of unfair pricing. Id. at 59.

Urenco argued that the [input] purchased from [Supplier A] is sold after enrichment to facilities not located in the United States. Urenco's Response at 45.  At oral argument, Urenco acknowledged that a portion of the [Utility A] contract provides for the sale of low enriched uranium.[21] Transcript at 80.  Urenco says that Commerce properly excluded [input] that Urenco acquired from an unaffiliated supplier and did not sell to customers in the United States because such contracts were not relevant to the cost of production calculation, precisely because the purchased product never reached the United States.  Urenco's Response at 45-46.  Both Defendant and Urenco agree that there was a sale of merchandise in the [Utility A] contract. Transcript at 71 (citing UD Sect. A Response).

Pursuant to statute, Commerce is required to exclude purchased product from the cost of manufacturing. See 19 U.S.C. § 1677b(e)(1).  The statute directs Commerce to calculate the costs

---

[21] Applying the Eurodif precedent, this particular LEU would remain within the scope of the Final Determination.

of materials to produce the subject merchandise, not the cost to purchase it.  This practice is

supported by the Federal Circuit.  Thai Pineapple Pub. Co. v. United States, 187 F.3d 1362, 1366

(Fed. Cir. 1999).[22]

As a result of Eurodif precedent, enrichment services SWU contracts are not included

within the scope of the Final Determination.  See Eurodif I-V.  The Federal Circuit's decision in

Eurodif II that the SWU contracts were contracts for services, and not goods, hinged on the

court's decision that title under the SWU contracts at issue never passed from the utility to the

enricher at any point in the enrichment process.  Eurodif I, 411 F.3d at 1362; Eurodif II, 423 F.3d

at 1278.  Pursuant to the court's remand in Eurodif IV, and as upheld in Eurodif V, Commerce's

Remand Redetermination contained language amending the scope of Commerce's Final

Determination to exclude SWU enrichment services contracts.  Eurodif IV, 431 F. Supp. 2d

1351; Eurodif V, 442 F. Supp. 2d 1367; Remand Redetermination.  The new scope language

essentially created a carve-out from the Final Determination, while sales of LEU covered by

SWU contracts may remain within the scope of the Final Determination.  Remand

Redetermination at 2; Eurodif V, 442 F. Supp. 2d 1367.  Therefore, under Eurodif precedent, and

as conceded by Urenco at oral argument, its sales of LEU to utilities in the United States could

still be included in the scope of the antidumping duty order.  See Eurodif V, 442 F. Supp. 2d

1367; Transcript at 80.

Here, a portion of the contract with Utility A for the production and sale of LEU involved

unenriched uranium originally purchased by Urenco, after which title and ownership were

_____

[22] This court in Eurodif IV noted that Commerce did not address the issue of affiliated
party feed purchase claims because it found that the remand instructions did not direct it open the
record on this issue.  Eurodif IV, 431 F. Supp. 2d at 1354.

transferred from Urenco to [Utility A], resulting in a sale of goods under Eurodif I and Eurodif II's logic. Transcript at 80; see Eurodif I, 411 F.3d at 1362; Eurodif II, 423 F.3d at 1278. Therefore, it is still within the scope of the Final Determination.  As clarified at oral argument, no portion of the [input] that Urenco purchased from its [Country A] supplier entered the United States.

Because the Remand Redetermination in the Eurodif line of cases did not directly pertain to the issues sub judice, Commerce's modification of the scope of the Final Determination to exclude uranium enrichment contracts, as upheld by this court in Eurodif V, is not automatically binding here.[23]  Since Commerce's Final Determination is sustained in this case, it is unnecessary to apply the Eurodif precedent because no antidumping duty order is in place.  Commerce made findings of zero and de minimis margins, no order was made; accordingly, no further action by this court or Commerce is necessary.

Plaintiff mistakenly argues that Urenco's failure to physically differentiate its purchased [input from its self-produced input for the U.S. utilities'] automatically means that all of the resulting LEU is included within the scope of the antidumping duty order.  The [input] that has not physically entered the United States cannot be subject to the antidumping duty order.  USEC misconstrues Pasta as requiring a direct physical tracking of the subject product; a tangible segregation of LEU is not realistic, and such an interpretation was rejected by the Federal Circuit in Eurodif I and Eurodif II. Eurodif IV, 431 F. Supp. 2d at 1354 ("[I]t is correct that a utility may not receive the LEU that was enriched from the exact unenriched uranium that it delivered to the

---

[23] The Remand Redetermination disposed of consolidated case numbers 02-00119 and 02-00221.

enricher . . . the Federal Circuit has already considered this issue and held that the

facts/arguments USEC raises in this respect are of no moment.") (citations omitted).[24]

Commerce did in fact confirm that the sales of the purchased product could be traced directly to

the Supplier with record evidence. Defendant's Response at 61 (citing Cost Calculation Memo at

4); see also Sales Verification Report at 4.  As verified by Commerce, and as Urenco reported,

"Urenco does not physically segregate uranium, except for [input from the Country A

supplier]."See Antidumping Duties on Low Enriched Uranium From the United Kingdom, the

Netherlands and Germany: Response to Section D of the Department's Supplemental

Questionnaire (May 30, 2001) ("UD Supp. Sect. D Response") at 31); Sales Verification Report,

Tab F, Exhibit 29.  That evidence is more than is required by Commerce.  Pasta does not require

physical separation; it only requires a relation between the cost and the subject merchandise

sufficient to demonstrate that the supplier is the considered a respondent. Defendant's Response

at 62; Pasta, 65 Fed. Reg. at 7356-57.

　　Additionally, in Pasta, Commerce did not impose a requirement of physical identity of the

tangible product; it required that the respondent separately identify the product "for sales

purposes" in order to track it. See Pasta, 65 Fed. Reg. at 7356.  As USEC acknowledged in its

Commerce Brief, Urenco does "track this [purchased input] on paper . . . and segregate[s] its own

production from [the purchased input]." Urenco's Response at 47 (citing USEC's Commerce

Case Brief at 107-08).  LEU, by its nature, is not physically or tangibly identifiable.

　　USEC also argues that "Urenco paid too much to its unaffiliated supplier for [input], so

---

[24] We are not dealing with widgets here, which can be physically marked and separated, but with LEU, which is in tracked in quantities under SWU contracts.

that it could also pay too little for [another form of processing]." Urenco's Response at 48 (citing

USEC's Motion at 47).  At verification, Commerce confirmed Urenco's documentation of the

transactions, concluding: "the prices paid by Urenco for each of these services/products are based

on terms specified in a long-term contract agreed to several years prior to the POI and between

unaffiliated parties." Decision Memo at 29 (citing Cost Calculation Memo at 4).  The  evidence

Commerce evaluated at verification confirmed that the price Urenco paid for [input] from its

unaffiliated supplier during the POI was set in a contract amendment [signed] prior to the POI.

Urenco's Response at 48 (citing Sales Verification Report Tab F, Exhibit 29).  Therefore,

Commerce concluded that "[w]e have found no evidence or incentive for the parties to have

negotiated unfair prices for [the other form of processing] at the expense of [input] purchases."

Cost Calculation Memo at 4 (alteration in original).[25]

Some of the [input] purchased by Urenco Ltd. were provided in the United Kingdom, but

no portion of the [purchased input] entered the United States.  It was proper for Commerce to

exclude [input] purchases that did not enter the country precisely because that particular

merchandise had no contact with the United States.  USEC's argument that because Urenco

---

[25] Urenco also points out that:

> USEC makes no allegation that the SWU price was above the
> market price at the time of this [contract amendment].  Rather, the
> sole foundation for USEC's claim is an amendment signed during
> the POI.  But the POI amendment did not alter the price set in the
> earlier amendment for deliveries in the POI; rather, it sets a
> [different contract term] for deliveries in [a later period].

Urenco's Response at 49.

failed to physically identify the purchased [input], it is deemed subject to the antidumping duty law, is unavailing.  Whether the [input] from [Supplier A] is a sale or a service, Commerce's exclusion of such [input] from the cost of production is supported by substantial evidence and in accordance with law.

### 3
### The Department Correctly Calculated Urenco's Constructed Value Profit Rate

USEC argues that Commerce miscalculated Urenco's Constructed Value ("CV") profit rate by making inconsistent adjustments. USEC's Motion at 49.  Specifically, by allowing Urenco's depreciation expenses, but by excluding its other cost items, USEC argues that Commerce understated Urenco's CV profit rate. Id.  "Commerce increased the depreciation expense contained in the cost of production for each Urenco subsidiary to reflect the fact that Urenco had understated the depreciation stemming from its purchases of capital assets from affiliated parties." Id.  Therefore, USEC argues, this issue must be remanded to Commerce for further explanation as to why Commerce failed to make parallel adjustments. Id. at 52.

Urenco responds that the Department correctly calculated the CV rate on a company-wide basis.[26] Urenco's Response at 49.  "In short, the Department accepted the obvious conclusion that if [Urenco Ltd.'s] total expenses had been higher, [Urenco Ltd.'s] company-wide profit would have been lower." Id. at 50 (citing Decision Memo at 28).  Urenco also argues that the Department properly included in the CV calculation all of the expenses included in the

---

[26] Calculations were made based on Urenco Ltd.'s audited financial statements. Commerce determined the amount of profit by deducting total expenses in 2000 from total turnover in 2000. See Cost Calculation Memo, Attachment 6 (citing Urenco Ltd. Cost Verification Exhibit 11, p.26, JA-9291).

calculation of Urenco Ltd.'s cost of production, and USEC's argument proposing the exclusion

of such expenses is barred because it failed to raise this argument during the administrative

proceedings. Id. at 51.

Defendant says that Commerce's adjustment to Urenco's cost of production by increasing

its depreciation expenses on its capital assets (specifically, centrifuges), was in accordance with

19 U.S.C. § 1677b(e) and agency practice.[27]  Defendant argues that USEC seeks a remand to

Commerce to consider other adjustments not raised at the administrative level. Id.  Therefore, it

says, USEC has failed to exhaust its administrative remedies in its request for Commerce to

make further adjustments to its CV profit calculation. Defendant's Response at 66, 71.

Pursuant to statute, CV is calculated by combining the 1) cost of materials and

fabrication; 2) sales, general, and administrative expenses and profit; and 3) costs for containers

and coverings. 19 U.S.C. § 1677b(e).  The cost of materials is calculated by a valuation of the

assets used to produce the merchandise, and by depreciating the value of those assets over a

number of years. § 1677b(f)(1)(A); Defendant's Response at 67.  Because Commerce found that

Urenco had purchased some of those assets from affiliated parties for less than the cost of

production, Defendant explains that Commerce used the "cost of production of those assets as a

surrogate for the market price." Defendant's Response at 67; see § 1677b(f)(2).  Commerce

explained why it used a surrogate value for market price in its Decision Memo, stating it may

"disregard transactions between affiliated persons if those transactions do not fairly reflect the

value in the market under consideration . . . . Because Urenco claimed it was not possible to

provide market prices for inputs received by each company from the other Urenco Group

---

[27] This is not disputed by USEC.

companies, we used the COP to determine the market value of the affiliated inputs." Defendant's

Response at 67-68 (quoting Decision Memo at 27).

"Commerce then increased the depreciation expense contained in the COP for each

Urenco subsidiary to reflect the value of capital assets purchased from affiliated parties." Id. at 68

(quoting Decision Memo at 28).  Explaining its rationale for its increase, Commerce stated that

> [t]he transfer price, however, did not include all . . . costs or net financing
> expenses, both of which are a components (sic) of the cost of production.
> Therefore, for the final determination, we increased depreciation expenses
> associated with those fixed assets.

Id. (quoting Decision Memo at 28).  Defendant further argues that because Commerce could not

calculate Urenco's NV using home market sales, it likewise could not rely on Urenco's sales for

the calculation of CV profit pursuant to 19 U.S.C. § 1677b(e)(2)(A). Id. at 69.  Because actual

data was unavailable, in accordance with section 1677b(e)(2)(B), Commerce looked to "actual

amounts incurred and realized . . . for selling, general, and administrative expenses . . . in the

same general category of products as the subject merchandise." 19 U.S.C. 1677b(e)(2)(B).  Thus,

Commerce arrived at a "global profit" figure, derived from Urenco's sales and divided it by a

"global COP," made up of all merchandise used in Urenco's profit calculations. Defendant's

Response at 69. "The result was . . . a percentage of profit, which it then applied to Urenco's

reported COP of subject merchandise . . . [which] was then added to Urenco's COP to determine

Urenco's CV." Id.

In its Preliminary Determination, Commerce did not initially take into consideration

Urenco's depreciation expenses.  See Preliminary Determination, 66 Fed. Reg. 36,748.  Urenco

argued that if Commerce imputes depreciation expenses on its capital assets (namely,

centrifuges), Commerce should likewise reduce Urenco's subsidiaries' profits with a depreciation

offset, because the increase in costs would necessarily reduce profits. Defendant's Response at

70.  Commerce replied that it was not required to make such an offset, but found that it was

reasonable. Id.; Decision Memo at 28.

USEC does not dispute any of Commece's depreciation offsets, but argues that

Commerce should have made other adjustments to its CV profit calculation since it already made

two.  USEC's Motion at 50-51.  Defendant responds that USEC failed to raise this argument in

its Comments on the Preliminary Determination before Commerce and is therefore barred from

raising it here.[28] Defendant's Response at 71 (citing Sandvik Steel Co. v. United States, 164 F.3d

596, 599 (Fed. Cir. 1998)).  USEC counters that it could not possibly have proffered an argument

at the agency level about adjustments that were yet to be made in the Final Determination.

USEC's Reply at 24.

Defendant's "exhaustion of administrative remedies" argument need not be addressed.[29]

Commerce has reasonably explained how and why it arrived at Urenco's profit rate, with the

increased depreciation adjustment, based on the evidence contained in the record. Commerce's

calculations and explanation are in conformity with 19 U.S.C. § 1677b(e) and (f).  Even though

---

[28] Defendant additionally argues that it would be "unreasonable" for Commerce to reconsider on remand only the new adjustments proposed by USEC, without opening the record for other interested parties to comment. Defendant's Response at 73.  Defendant states that such a remand is contrary to the underlying policies of the exhaustion doctrine. Id. at 74 (citing Unemployment Compensation Comm'n of Alaska v. Aragon, 329 U.S. 143, 155, 67 S. Ct. 245, 91 L. Ed. 2d 136 (1946).

[29] Defendant's exhaustion argument is without merit because Plaintiff was not in a position to argue for additional adjustments to the CV profit calculation at the administrative level.  Because Commerce adjusted Urenco's CV profit rate in the Final Determination, the only opportunity for Plaintiff to contest that adjustment was before this court.

Commerce's interpretation of § 1677b(e) and (f) was not required, it was a permissible and reasonable construction of the statute. See Chevron, 467 U.S. at 843 n.11.

**V**
**Country Specific Issues**
**A**
**Low Enriched Uranium From the United Kingdom, Court No. 02-00112**
**1**
**Commerce Properly Allocated a Proportion of Urenco's Centrifuge Losses as Period Costs in its Calculation of Constructed Value**

USEC argues that not including the entire amount of UCL's centrifuge failure losses in Commerce's cost of production calculation because they were deemed not to be within the POI, was incorrect and runs contrary to agency precedent. USEC's Motion at 52-53. USEC also objects to Commerce's treatment of such losses as period costs, because UCL reported these losses as "materials costs" and because the loss did not relate to the "company as a whole" since the equipment was used for other activities besides the production of LEU. Id. at 54; see 19 U.S.C. 1677b(f)(1)(A) (directing agencies to follow a producer/exporter's accounting records when they are in accordance with generally accepted accounting principles ("GAAP")). Therefore, USEC asks that the Final Determination be remanded to Commerce to include the full amount of UCL's centrifuge losses as manufacturing costs. Id. at 55.

Additionally, USEC argues that Commerce "gave no rationale for departing from Urenco's normal accounting treatment for this loss," and that any arguments by Defendant or Urenco now "constitute[] post hoc rationalization by counsel." USEC's Reply at 25-26.  In particular, USEC refers to Defendant's argument in its Response that it applied its normal methodology of treating maintenance costs as manufacturing period costs, and that centrifuge

41

replacement benefits production throughout the fiscal year. Id. at 26.  Therefore, USEC claims, in

the absence of an explanation, Commerce should have applied Urenco's classification of the

expense.[30] Id. at 27.

USEC relies on Steel From Korea as support for its argument that the replacement of

Urenco's centrifuges "to restore Urenco to full capacity" is more comparable to plant expansion

expenses (a manufacturing cost), rather than "certain maintenance expenses" for replacements.

Id.; see Final Determinations of Sales at Less Than Fair Value: Certain Hot-Rolled Carbon Steel

Flat Products, Certain Cold-Rolled Carbon Steel Flat Products, Certain Corrosion-Resistant

Carbon Steel Flat Products, and Certain Cut-to-Length Carbon Steel Plate from Korea, 58 Fed.

Reg. 37,176, 37,187 (July 9, 1993) ("Steel From Korea").  In Steel From Korea, Commerce

treated replacement expenses as period costs and included them in the cost of production to the

extent allocable within the POI. Id.  USEC has not cited any direct support for the proposition

that a large replacement cost transforms into a POI related expense on par with expansion.

UCL listed the costs associated with its centrifuge failures as "materials costs applicable

solely to production during the POI," but Commerce characterized it as a period cost in the Final

Determination, allocating it proportionately throughout the year incurred. Defendant's Response

at 75, 82 (citing Decision Memo cmt. 23).  Commerce's decision to allocate the cost

commensurate to the portion that fell within the POI is consistent with agency practice and with

the evidence provided by Urenco in the record. Id. at 76 (citing Decision Memo cmt. 23); see,

e.g., Steel From Korea, 58 Fed. Reg. at 37,187 (stating that production assets, such as rollers and

---

[30] USEC argues in both of its briefs, concerning all other issues in this case, that
Commerce should depart from Urenco's established accounting procedures.

parts, "benefit production throughout the fiscal year" and are treated as period costs).

Specifically, Commerce found that centrifuge failure is not "unusual in nature" or "infrequent in

occurrence" and Urenco's financial statements expensed the entire amount associated with loss.

Decision Memo cmt. 23.  Pursuant to statute, Commerce is directed to follow a respondent's

normal accounting methodology when it is consistent with accounting standards and is

reasonable. 19 U.S.C. § 1677b(f)(1)(A).[31]

Another reason for Commerce's allocation of period costs, Defendant argues, is that they

benefit production throughout the fiscal year, unlike material costs. Defendant's Response at 77;

see also Notice of Final Determination of Sales at Less Than Fair Value: Fresh Atlantic Salmon

from Chile, 63 Fed. Reg. 31,411, 31,436 (June 9, 1998) (By spreading period costs

proportionately over the POI, each product absorbs proportionate amount of period costs; period

costs are more related to an accounting period and manufacturing costs are more related to a

particular product).

Because UCL's primary business and "the source of virtually all its revenue, is the

enrichment of uranium using centrifuges," it was reasonable for Commerce to attribute a

_____

[31] Commerce shall normally calculate costs according to the following criteria:

> [B]ased on the records of the exporter or producer of the
> merchandise if such records are kept in accordance with the
> generally accepted accounting principles of the exporting country
> (or the producing country, where appropriate) and reasonably
> reflect the costs associated with the production and sale of the
> merchandise . . . .

19 U.S.C. § 1677b(f)(1)(A).

43

proportionate amount of the losses over the POI.[32] Urenco's Response at 53; Decision Memo

cmt. 23.  USEC offers no support for its proposition that the statute prohibits Commerce from

allocating period costs throughout the POI, and ignores Commerce's longstanding practice of

treating replacement expenses as period costs.  Indeed, the statute does not speak directly to this

matter.  USEC cites U.S. Steel Group v. United States, 22 CIT 104, 105-06, 998 F. Supp. 1151

(1998) in support of its argument that "Commerce's rationale for allocating only a portion of

these losses to POI production was its conclusion that these losses constituted a 'period cost.'"

USEC's Motion at 53.  While U.S. Steel held that "G&A [general and administrative] expenses

are those expenses which relate to the activities of the company as a whole rather than to

production process," it does not address the attribution of losses over the POI in Commerce's

cost of production and constructed value calculation, which is the crux of Plaintiff's argument.

U.S. Steel, 22 CIT at 106 (citing  Rautaruukki Oy v. United States, 19 CIT 438, 444 (1995)).

U.S. Steel does not mention period costs, but describes G&A expenses, not applicable here.

Because Urenco allocated period costs over the fiscal year in which they were incurred, the costs

were properly allocated over the nine-month portion of the POI that overlapped with the fiscal

year.

　　　　Additionally, USEC's argument to include the entire cost of the replacement centrifuges

would "unreasonably attribute replacement costs" to LEU sold outside the POI. Defendant's

---

[32] In Commerce's Decision Memo, it held that Urenco's centrifuge failure was not "unusual in nature" or "highly abnormal" because it is clearly related to the production of LEU since centrifuges are critical to the production of uranium.  Decision Memo cmt. 23 (citing Antidumping Duties on Low Enriched Uranium From the United Kingdom: Response to Section A of the Department's Questionnaire (April 2, 2001) ("Urenco Sect. A Response"), Exhibit D-14 at 3, and Exhibit D-16 at 5).

Response at 82.  Consistent with the rationale in <u>Steel From Korea</u> and section 1677b(f)(1)(A), centrifuges are a production asset and costs of replacing them benefit production throughout the year; thus, Commerce's treatment of Urenco's centrifuge losses as period costs and allocating the cost of replacement centrifuges is supported by substantial evidence and is in accordance with law.

**2**
**The Department Correctly Excluded Urenco's Research and Development Costs from its CV Determination**

USEC argues that Commerce miscalculated UCL's research and development ("R&D") rate by excluding costs associated with the New Products Division ("NPD"). USEC's Motion at 55.  USEC further argues that Commerce's allegedly erroneous conclusion that such R&D projects generated revenue, led it to wrongly exclude these costs in its calculation of Urenco's cost of production. <u>Id.</u>  USEC claims that 19 U.S.C. § 1677b(f)(1)(B) requires Commerce to include a share of R&D expenses where a respondent incurs expenses on new products, therefore, Commerce understated Urenco's cost of producing LEU by excluding non-recurring expenses rather than reflecting them in the calculation of cost of production. USEC's Motion at 57; USEC's Reply at 30.

At oral argument, USEC clarified its argument, stating that because there were "no discernible sales" from the NPD as per Commerce's verification report, the only way for the NPD to be financed was internally, that is, through profit from Urenco's uranium enrichment division. Transcript at 52.  Because the R&D on new products had no sales, USEC added, its expenses should be attributable to general R&D. <u>Id.</u> at 54.

45

Defendant counters that Commerce's determination to exclude R&D expenses pertaining to Urenco's NPD from its calculation of CV was correct because they related to the development and production of non-subject merchandise. Defendant's Response at 83 (citing <u>Decision Memo</u> cmt. 19).  Urenco adds that USEC's reliance on § 1677b(f)(1)(B) is misplaced, given that the statute and preamble address whether a nonrecurring expense should be expensed in the year in which the expense occurred, as opposed to amortizing it in future years. Urenco's Response at 57.

 USEC cites previous final determinations made by the Department in support of its arguments; however, they support Defendant's arguments under the particular facts of this case. Specifically, longstanding agency practice has been to include R&D expenses in its CV calculation only when the benefits of R&D could not be tied to a specific product or production activity. <u>See</u> <u>Final Determination of Sales at Less Than Fair Value: Fresh Cut Roses From Colombia</u>, 60 Fed. Reg. 6,980, 7,016 (February 6, 1995) (including R&D expenses in CV calculation after finding no conclusive evidence that the R&D related specifically to production). The underlying factual basis for that determination was directly contrary to the agency's record in this case.  Here, Commerce has found no evidence demonstrating any linkage between Urenco's NPD activities and its LEU production.

Section 1677b(f)(1)(A) directs Commerce to calculate CV based on the records of the producer/exporter, when in accordance with GAAP of the exporting or producing country. Addressing USEC's claim that the statute directs Commerce to include the R&D expenses, Urenco correctly explains, "[n]othing in the language quoted from the Preamble to Proposed Rules indicates that the Department's policy is to include in the cost of producing subject

merchandise a company's R&D costs unrelated to subject merchandise." Urenco's Response at

57.  In the Preamble to Proposed Rules, it states, "because of the fact-specific nature of

determinations involving nonrecurring costs, the Department has not drafted any regulations to

implement section 773(f)(1)(B) of the Act [19 U.S.C. § 1677b(f)(1)(B)]." <u>Antidumping Duties;</u>

<u>Countervailing Duties</u>, 61 Fed. Reg. 7,308, 7,342 (February 27, 1996) ("<u>Preamble to Proposed</u>

<u>Rules</u>"); <u>see</u> <u>also</u> <u>Preamble to Final Rules</u>, 62 Fed. Reg. at 27,362.  The subsection of the statute

is a general provision, guiding Commerce to calculate costs "based on the records of the exporter

or producer of the merchandise, if such records are kept in accordance with the [GAAP] of the

exporting country . . . ." 19 U.S.C. § 1677b(f)(1)(A).  Subsection (B) only notes that "[c]osts

shall be adjusted appropriately for these nonrecurring costs that benefit current or future

production . . . ." § 1677b(f)(1)(B).  Section (f) contains more specific instructions on calculating

sales at less than the cost of production and CV in sections (b) and (e), and is not the basis by

which Commerce makes its calculations.

Upon review of Urenco's records, Commerce found "that [Urenco Ltd.'s] New Products

Division is dedicated to the development and production of two major products unrelated to the

enrichment process," and the work conducted there "provide no intrinsic benefits to Urenco's

enrichment activities." Defendant's Response at 85 (citing <u>Decision Memo</u> cmt. 19); Urenco's

Response at 54.  USEC argues that R&D expenses may only be excluded from the CV

calculation when the respondent is producing <u>and selling</u> the non-subject merchandise.  The

reasoning is that generation of revenues is the determinative factor in whether to include

expenses in the CV calculation. USEC's Motion at 57 (citing <u>Notice of Final Determination of</u>

<u>Sales at Less Than Fair Value: Static Random Access Memory Semiconductors From the</u>

Republic of Korea, 63 Fed. Reg. 8,934, 8,939-41 (February 23, 1998) ("SRAMS")). USEC's

Motion at 57.

SRAMS is, however, distinguishable from the case at bar. In SRAMS, Commerce

determined that because there was "significant cross-fertilization" between R&D work and the

subject merchandise, all R&D expenses should be allocated over all products. SRAMS, 63 Fed.

Reg. at 8,939. Here, USEC has not alleged, and the Department has not identified, any potential

cross-fertilization between Urenco's NPD and its LEU enrichment.

The Department arrived at the same conclusion in Dynamic Random Access Memory

Semiconductors of One Megabit or Above From the Republic of Korea; Final Results of

Antidumping Duty Administrative Review, 61 Fed. Reg. 20,216, 20,218 (May 6, 1996)

("DRAMS"), finding that R&D costs cannot be included in the CV calculation in the absence of

"any record evidence of R&D cross-fertilization." Id. (citing Micron Tech. v. United States, 19

CIT 829, 832, 893 F. Supp. 21 (1995), aff'd, 117 F.3d 1386 (Fed. Cir. 1997)). Urenco explains

its NPD as "a laser process to enrich and deplete non-radioactive materials such as gadolinium

and it develops processes for the manufacture of power storage flywheels; it performs no activity

that benefits Urenco's uranium enrichment activities."[33] Urenco's Response at 54-55.

In Micron Tech., the court rejected Commerce's inclusion of R&D costs unrelated to the

subject merchandise in its calculation of CV of the subject merchandise. Micron Tech., 19 CIT at

831. The court held that expenses associated with R&D not directly related to the subject

merchandise, and which do not provide an "intrinsic benefit" to the subject merchandise, should

not be included in the cost of production. Id. at 832. Because substantial evidence did not

---

[33] Urenco corroborated this statement at oral argument.

support a determination that the subject merchandise intrinsically benefitted from R&D for non-subject merchandise, the court directed Commerce to amend its calculation in its Final Determination. Id.; see Final Determination of Sales at Less than Fair Value: Dynamic Random Access Memory Semiconductors of One Megabit or Above From the Republic of Korea, 58 Fed. Reg. 15,467, 15,472 (March 23, 1993) ("DRAMS 1993").  A review of agency precedent shows that Commerce has consistently used the "intrinsic benefit" analysis as the relevant test, and not the method which USEC advocates. See, e.g., SRAMS, 63 Fed. Reg. 8,934; DRAMS, 61 Fed. Reg. 20,216l; DRAMS 1993, 58 Fed. Reg. 15,467.

Because the Department determined, based on the record, that UCL's R&D associated with its NPD provided no "intrinsic benefits to Urenco's enrichment activities," its determination is supported by substantial evidence and is in accordance with law.

## B
### Low Enriched Uranium From Germany, Court No. 02-00113[34]
### Commerce Properly Accepted Urenco Deutschland's Tails Disposal Costs Estimate

By failing to adjust Urenco Deutschland's ("UD") accrued expense for tails disposal, USEC argues that Commerce understated its cost of production and committed "legal error." USEC's Motion at 53. USEC argues that the Supplier, [Supplier A's] price was "an appropriate 'benchmark' for determining whether UD's tails accrual was reasonable," and that Commerce's determination that the small difference between the [Supplier A] price and UD's estimates proved UD was reasonable is unsupported by substantial evidence. USEC's Reply at 25-26.

Defendant argues that UD's valuation of disposal costs for depleted uranium tails was

---

[34] All briefs and appendices containing the administrative record cited in this section were filed in case number 02-00113.

reasonable and Commerce's use of these figures is supported by the record. Defendant's Response at 75.

Germany's GAAP require that producers of LEU include in their annual expenses, in the normal course of business, costs associated with tails disposal, even if the tails were not disposed. 19 U.S.C. § 1677b(f)(1)(A); Defendant's Response at 76.  UD estimated its costs because it kept its tails in a storage facility. Id.  Its estimates were based on an official quote provided by [Supplier B, an unaffiliated third party]. Id. at 77 (relying on UD Supp. Sect. D Response at 16, Exhibit 8, at 10-11).  Urenco disputes USEC's assertion that Urenco's accrual for the expenses of tails disposal is based only on "Urenco's internal estimates," rather, it argues it is based on "information from other sources, including cost proposals from unaffiliated third parties." Urenco's Response at 5; USEC's Motion at 4. Commerce reviewed UD's estimates at verification and found them to be reasonable estimations of disposal costs. See Memorandum from Ernest Z. Gziryan, Accountant, U.S. Dep't of Commerce, to Neal M. Halper, Dir., Office of Accounting, U.S. Dep't of Commerce, regarding Antidumping Duty Investigation of Low Enriched Uranium from Germany: Verification of the Cost of Production and Constructed Value Data submitted by [UD] (September 25, 2001) ("Germany Cost Verif. Report") at 16-18. Commerce based its determination on meetings with nuclear enrichment scientists, reviewing Urenco's cost determination report, and by comparing UD's 2000 tails estimate with the cost of sending tails for [another form of processing to Supplier A], its unaffiliated supplier. Defendant's Response at 78-79 (citing Germany Cost Verif. Report at 16-18, and UD Supp. Sect. D Response at 16-18, Exhibit 9, at 12).

Defendant agrees with USEC that the Department does not usually rely on estimates for

its calculations. See Stainless Steel Wire Rod from Spain; Final Results of Antidumping Duty Administrative Review, 66 Fed. Reg. 10,988 cmt. 2 (February 21, 2001); Decision Memo cmt. 2. But, it says, here USEC fails to distinguish that UD's figures were merely estimates of future disposal and costs of future expenditures, and it was not possible to provide a concrete price for disposal. Defendant's Response at 82.

USEC also argues that Commerce erred by not choosing the higher [Supplier B] estimate for tails disposal. USEC's Motion at 56. Commerce was aware of the higher tails disposal cost estimate from [Supplier B in Year A], however, Defendant argues that UD explained that it was not a formal quote received by UD, but priced as a "testing market" because [Supplier B] did not have the capacity in [Year A] to dispose of all of its tails as it did in [Year B]. Defendant's Response at 80 (citing UD Supp. Sect. D Response, Exhibit 8, at 6); Germany Cost Verif. Report at 18. In its Decision Memo incorporated in the Final Determination, Commerce dismissed UD's claims that adopting its own estimates would distort Commerce's methodology, noting that "[w]e found no reason to believe that these assumptions represent a manipulation of Urenco's financial reporting." Decision Memo at 29. Commerce also explained that under German GAAP, a company can choose a method of computing which permits depreciation of expenses. Id. cmt. 21. Urenco argued before Commerce that its accounting should not be followed because the particular method was selected for the benefit of a tax advantage under German law. Id. However, Commerce ultimately determined that because UD had used a "widely accepted depreciation method" approved by UD's own auditors and prepared in accordance with German GAAP, it was reasonable to accept UD's reported costs. Id.

For the purpose of calculating CV, 19 U.S.C. § 1677b(f)(1)(A) states that costs shall

normally be calculated on the basis of the records of the exporter or producer, when in accordance with GAAP. <u>Id.</u>  Based upon the reasons explained above, and because UD's accounting records are annually audited, Commerce found the difference between the [Supplier A] figure and UD's estimate was minimal enough not to question the reasonableness of UD's estimates. <u>Germany Cost Verif. Report</u> at 17.  Therefore, Commerce properly determined that UD's records satisfied the statute and were appropriate to use in its CV calculations. <u>Decision Memo</u> cmt. 16.

USEC further argues that UD understated its tails accrual by 6.9 percent, based on a comparison between UD's tails disposal provision with the cost of [another form of processing] performed by [Supplier A, a Country A company]. USEC's Motion at 55.  USEC also asserts that the Department "implicitly concluded" that [Supplier A's] price was the "market rate." <u>Id.</u>  In its verification report, Commerce states that the Department made this comparison only "to assess the reasonable of UD's year 2000 tails provision." <u>Germany Cost Verif. Report</u> at 16.   Urenco also says the price of [Supplier A's other form of processing] was only for a limited quantity. <u>UD Supp. Sect. D Response</u>, Exhibit 8 at 9.  Because Commerce investigated UD's estimates at verification, and there is no evidence presented to support USEC's claims of "manipulation," USEC's argument fails.

USEC also claims that because UD's tails disposal costs were adjusted by Commerce, UNL's costs should have likewise been changed. USEC's Motion at 54.  However, Urenco argues, and as Commerce noted at verification, "each company uses different cost assumptions for the final disposal of tails and different timing of future payments, which affects discounting of the charges to present value . . . . As such, it may not be appropriate to simply compare each

Urenco company's final disposal cost of tails . . . ." Germany Cost Verif. Report at 17-18.

Further, in Commerce's Decision Memo, it stated that UNL's situation was different "due to the

fact that UNL's tails provision is premised on certain services provided by an affiliated party."

Decision Memo at 30.  UD's tails provision, on the other hand, is premised on services provided

by an unaffiliated party, thus accounting for a difference in estimates.  According to 19 U.S.C. §

1677b(f)(2),[35] transactions between affiliated parties may be disregarded if the amounts do not

fairly reflect market rates.  In addition, the final tails disposal provision "depends on numerous

counterbalancing factors," including the fact that the three Urenco companies estimates differ

because storage capacity at each company's facilities differ. Defendant's Response at 56 (citing

Germany Cost Verif. Report at 16-18).  Urenco's Response at 56 (citing Germany Cost Verif.

Report at 16-18).  The record evidence shows that exact comparisons are not possible.

USEC offers no evidence to support its assertions, aside from claiming Commerce

"implicitly" makes its determinations.  USEC's entire argument is built on speculation, with a

conspicuous absence of factual support. USEC even goes so far as to argue that "the fact that

UD's assumptions may be required 'German government policy' or German law is simply

irrelevant." USEC's Reply at 27.  In the absence of evidentiary support for USEC's arguments,

---

[35] 19 U.S.C. § 1677b(f)(2) states:

A transaction directly or indirectly between affiliated persons may be disregarded
if, in the case of any element of value required to be considered, the amount
representing that element does not fairly reflect the amount usually reflected in
sales of merchandise under consideration in the market under consideration.  If a
transaction is disregarded under the preceding sentence and no other transactions
are available for consideration, the determination of the amount shall be based on
the information available as to what the amount would have been if the
transaction had occurred between persons who are not affiliated.

and in light of Commerce's reasonable explanations, the Department's treatment of the tails

disposal cost was supported by substantial evidence and in accordance with law.

**C**

**Low Enriched Uranium From The Netherlands, Court No. 02-00114**

There are no country-specific issues in this case.

**VI**

**Conclusion**

All parties having agreed at oral argument that if the court sustains Commerce's findings,

all of the issues in these cases are decided.[36]  Commerce's Final Determination is sustained and

USEC's Motion for Judgment Upon the Agency Record is Denied.


/s/ Evan J. Wallach____
Evan J. Wallach, Judge


Dated:       May 4, 2007
             New York, New York

---

[36] Transcript at 75, 77, 80, 81.

54

UNITED STATES COURT OF INTERNATIONAL TRADE

_____
USEC INC. and UNITED STATES          :
ENRICHMENT CORPORATION,              :
                                     :
          Plaintiffs,                :
                                     :    Before:      WALLACH, Judge
          v.                         :    Court Nos.:  02-00112, 02-00113,
                                     :                 02-00114
UNITED STATES,                       :
                                     :
          Defendant.                 :
_____:

ORDER AND JUDGMENT

    This case having come before the court upon the Motion for Judgment Upon the Agency Record filed by USEC Inc. and United States Enrichment Corporation (collectively, "Plaintiffs' Motion"); the court having reviewed all pleadings and papers on file herein, having heard oral argument by each party, and after due deliberation, having reached a decision herein; now, in conformity with said decision, it is hereby

    ORDERED ADJUDGED AND DECREED that Plaintiffs' Motion is DENIED, and it is further

    ORDERED ADJUDGED AND DECREED that the decision of the U.S. Department of Commerce ("Commerce") in Notice of Final Determinations of Sales at Not Less Than Fair Value: Low Enriched Uranium From the United Kingdom, Germany and the Netherlands, 66 Fed. Reg. 65,886 (December 21, 2001) is hereby SUSTAINED; and it is further

    ORDERED that all parties shall review the court's Opinion in this matter and notify the court in writing on or before Tuesday, May 15, 2007, whether any information contained in the Opinion is confidential, identify any such information, and request its deletion from the public version of the Opinion to be issued thereafter.  The parties shall suggest alternative language for any portions they wish deleted.  If a party determines that no information needs to be deleted, that party shall so notify the court in writing on or before May 15, 2007.


                                    /s/ Evan J. Wallach_____
                                      Evan J. Wallach, Judge

Dated: May 4, 2007
       New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                          Deputy Clerk